**GEORGE R. DARCHE ASSOCIATES, INC., Plaintiff,**

v.

**BEATRICE FOODS COMPANY, Defendant.**

**Civ. No. 80–1447.**

United States District Court, D. New Jersey.

April 20, 1981.*

* Affirmed, No. 81–2009, CA–3 judgment order of January 27, 1982.

Schenck, Price, Smith & King by Clifford W. Starrett, Morristown, N. J., for plaintiff.

Pitney, Hardin & Kipp by Marc S. Klein, Morristown, N. J., for defendant.

## OPINION

BIUNNO, District Judge.

This case involves the economic and contractual relationships between a producer/manufacturer and its manufacturer's representative serving it for some years in a designated territory as an independent contractor. The legal question involves the applicability of state regulatory legislation dealing with "franchises", and their impact on the right of the producer to terminate the relationship because of its own decision, sound or unsound, about the most effective and efficient method of marketing its product line.

The case comes before the court on cross-motion for summary judgment on all issues except damages. All of the underlying evidential facts are undisputed, a point established on the record of the hearing on February 23, 1981, along with some historical background on general context which the parties agreed could be judicially noticed.

Suit was begun in the Superior Court of New Jersey and removed here for diversity of citizenship. For all practical purposes (except for details of federal procedure) the court sits for this case as the functional equivalent of the Superior Court.

The relationship began some 20 years ago on an informal arrangement with Modern Home Products, a company with a plant in Wisconsin that manufactured gaslight post lamps and gas-fired barbecue outdoor grills. At some stage gas-fired logs for fireplaces seem to have been added, and most recently, a device called a "bug zapper", evidently electrical, became part of the line. The products were marketed under the name "Charmglow".

In about 1967, Beatrice Foods acquired Modern Home Products, evidently as a subsidiary, followed by a merger after which

the business was continued as the Charmglow Division of Beatrice Foods.

The product line, as noted, is a narrow one for what might be called gas based accessory appliances for household use. There are no major appliances in the line, such as gas cooking stoves, gas water heaters, gas furnaces, gas refrigerators, or the like. The gas appliances in the line could be used with either piped gas from a utility company, or with bottled gas such as propane and the like. Some items, such as barbecues, smokers and lamps, were later offered as electric versions. The line Darche handled was made up of barbecues, smokers and lamps.

Throughout the period before and after acquisition by Beatrice Foods, the marketing system used for this line employed three channels of distribution. One was by volume sales to gas utility companies, another was by volume sales to large retail chains and/or mail order houses, and the third was by sales to regular wholesalers who in turn served local retail outlets selling to ultimate consumers. All sales were made through these three channels of distribution at manufacturer's prices. No direct sales were made.

Darche's geographical territory, which appears not to have changed during its relationship, embraced the New England States (Maine, New Hampshire, Vermont, Massachusetts, Rhode Island and Connecticut), New York, New Jersey, Eastern Pennsylvania and one county in Delaware (10 States or parts of States in all).

Although there were letters memorializing the informal agreement, the earliest found being 1964, the relationship was not reduced to a formal written instrument until 1976. In 1977, another formal agreement was prepared but the record indicates it was signed by Darche and may not have been signed and delivered by Beatrice. The uncertainty is not significant since another formal agreement was prepared in late 1978, two copies sent to Darche and instructions given to sign one copy and return it by December 31, 1978, retaining the other. Darche's copy bears two signatures, one for Beatrice (undated) and the other for Darche dated December 18, 1978.

Over the entire period Darche's function was to solicit orders for items in the product line from buyers in its territory other than ultimate consumers. The prices were set by the manufacturer, and the orders sent to it. The manufacturer passed on the buyer's credit, and if the order was accepted shipped directly to the buyer. The responsibility to fill the orders and collect payment, as well as the risk, was the manufacturer's, although Darche may have provided some follow up to support collection efforts.

For a brief period, the products were sold to Darche and warehoused for resale, but this arrangement was soon discontinued and is not material to the case. Essentially, Darche had a New Jersey office location from which it supervised its own employees as they rode circuit through its territory soliciting orders.

Darche was compensated by payment of a commission on the sales it produced, at 5% for most of the period. There was no separate reimbursement or payment for expenses, such as travel or advertising.

Selling prices were at all times set by the manufacturer, and Darche had no authority to negotiate or set any different prices. During the two periods when State fair-trade laws were authorized, first by the Miller-Tydings Act (1937), and again after the McGuire Act (1952) minimum resale prices may have been set to prevent price-cutting at the retail level, but the record is silent on this point and it is now some years since those laws have had force, and that part of the history, whatever it was, is not pertinent or material here.

Identification of the functions of Darche and analysis of the relationship between the parties is as much a matter of the economics of marketing and of the law merchant as it is of pure law. The underlying structure must be described and understood before the law can be applied.

There are many methods of marketing and distribution to move products from

manufacturer to ultimate consumer, and a wide variety of channels through which this trade is carried on. At one extreme there is the manufacturer who sells directly to the ultimate consumer. At the other end there is the manufacturer who relies wholly on a selling agent so as to be relieved, through necessity or choice, of performing any marketing function whatever. In between these two extremes there are countless arrangements and combinations of them.

From an economic and structural standpoint, it is common to classify these arrangements according to various elements, keeping in mind that the group as a whole comprises "middlemen" who in one way or another move the products of manufacture through the various channels of trade.

They are classified according to whether they take title or not. They are classified according to whether they physically store and ship. They are classified according to whether they can negotiate and set prices, or not. They are classified according to whether they provide financing assistance or not. They are classified according to whether a product line can be marketed by itself, or whether the products of others must be gathered and combined in order to effectuate sales.

For a brief description of the economic and functional characteristics of these different modes of marketing, see Lincoln Library of Essential Information, 34th Ed., 1971 (Frontier Press, Columbus, Ohio) in the section on Economics and the Useful Arts dealing with marketing and the wholesaling structure, at pp. 1242–1243. [See Appendix].

In this case, as analysis of the written agreement shows, Darche's status as a manufacturer's representative acting as an independent contractor carries less authority than would a "sales agent."

"A sales agent or agency makes sales and performs other sales services on behalf of a principal in return for a fee or commission. As in any other agency relationship, the sales agent binds his principal by his actions within the scope of his authority. The principal sets the sales policies, determines the agent's responsibilities, and remains directly responsible to the customer with respect to the product." *Bender*, Business Organizations, Vol. 15 § 2.03(9) (1980).

In the language of the agreement, Darche was appointed "Sales Representative as representative for the solicitation of orders" for the designated territory. (Par.A). No deviations were to be made from the printed price list or standard terms and conditions of sale (Par. C). All orders "will be considered an offer to purchase until accepted by Charmglow", and could be accepted in whole or in part. "Acceptance will take the form of a shipment on the order." Shipment of less than an entire order was acceptance of that part actually shipped. (Par. C).

Commission percentage was not set by the agreement; rather, the rates would be stated on commission schedules published by the manufacturer from time to time, with changes effective on orders taken after notice of the change (Par. D).

The manufacturer could alter the territory on 30 days' notice, but the representative would be entitled to commissions on shipments made before the end of the 30 days (Par. E).

Either the manufacturer or the representative could cancel the agreement on 60 days' written notice to the other. In that event, the representative would be entitled to commissions before the effective date of termination (Par. F).

In sum, the relationship was the same, in a functional sense, as though the manufacturer's representatives, taken together, composed the sales department of the manufacturer itself, but not as employees or sales agents and without authority to bind the manufacturer to contracts for sale of the product. This is but one of the many and varied structures for marketing manufactured goods through various channels of trade, generally outlined above.

The term "franchise" nowhere appears in the agreement. It could be used here only in the lay sense of applying to an arrange-

ment dealing with a specific geographic market area, even though it is not indicated to be "exclusive".

The last written contract is for a one year term from August 1, 1978, although not sent out until December 6 and signed by Darche on December 18.

On July 30, 1979, one day before the last day of the one year term, a sales meeting was held in St. Charles, Illinois. All the manufacturer's representatives attended as well as some wholesalers. Fox, the new president of the Charmglow Division, announced that a new marketing system would be used. Under this, a number of sales employees of the manufacturer (known as "zone managers") would deal with and obtain orders from all three wholesale channels mentioned above: national accounts, utility companies and wholesaler/distributors. The manufacturer's representatives thereafter would solicit only retail accounts, on which the commissions would be 2%.

Whether there was a formal announcement or not is not clear, but Darche was told by a zone manager that manufacturer's representatives would be out of the picture within a year.

No new written agreement was prepared or signed for the year beginning August 1, 1979. By discussion or mutual understanding, Darche continued serving as manufacturer's representative under the new selling arrangement.

The record of a staff meeting of early October, 1979, discloses that Mr. Fox told the zone managers that all sales would be handled directly by them, thus ending the function of the manufacturer's representatives.

On October 17, 1979, Darche received a letter terminating the relationship "immediately". This was followed by another letter a few days later, to the effect that Darche was to continue as manufacturer's representative until December 17, 1979, to provide the 60 days' notice specified in the last written agreement.

No federal statute on the subject is involved. The court is aware of only two that deal with franchise. One is the 1956 law, 70 Stat. 1125, found as 15 U.S.C. § 1221 et seq., applicable to franchised automobile dealers. The other is the 1978 law, 92 Stat. 332, found as 15 U.S.C. § 2801 et seq. subchapter 1 of which applies to motor fuel franchises. Neither statute applies here.

■ There are statutes in various States dealing with franchise arrangements generally and without regard to the nature of the product. In New Jersey, for example, there is a Franchise Practices Act, N.J.P.L.1971, c. 356, found at N.J.S.A. 56:10–1 et seq. Wisconsin, where the products are manufactured, has a statute on the subject, Wisc. Stat.Ann. § 135.01 et seq. Their significance turns on whether they regulate the authority to terminate a franchise.

As first presented, the Darche claim was that the dispute was governed by the Wisconsin statute or, if not, by the New Jersey statute. Beatrice countered that Illinois law applied because the last written contract, in paragraph J–4 says that:

> "All provisions hereof will be interpreted under the law of the State of Illinois, since it is the location of the principal office of Beatrice Foods Co."

Darche responded by arguing that this provision dealt only with matters of interpretation and did not amount to a requirement that Illinois law should "govern".

Thus, as presented, the dispute called for a penetration of the New Jersey conflict of law rules first before the merits could be addressed. Since this exercise has legal significance only when the laws of various potential jurisdictions are in conflict, the court chose to explore first whether there was a conflict. At oral argument it called for further submission of the text of such franchise statutes as existed in any of the 10 States of Darche's territory, plus Wisconsin and Illinois.

These have been supplied and inspected, and it thus appears that none applies to the relationship between Beatrice and Darche.

*Wisconsin.* This law does not apply because it defines a covered dealer as one who is a grantee of a "dealership situated in this State." The provision, "situated in this State" was added by amendment of November, 1977. Before that amendment there were four reported court decisions applying the original Wisconsin law to dealers located outside of Wisconsin. None was a decision by a Wisconsin court. The last agreement, signed by Darche on December 18, 1978 (after Charmglow had signed), is more than a year after the Wisconsin law was amended, and Darche never had a dealership "situated" in Wisconsin. No "impairment of contract" issue arises because the parties made a new contract after the amendment of the statute.

Nor can Darche rationally claim a dealership "situated" in Wisconsin on the ground that Charmglow is there. The purpose of the Wisconsin law was to protect Wisconsin dealers, see *CA May Marine Supply v. Brunswick Corp.*, 557 F.2d 1163, at 1166 (CA 5, 1977), and *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 300 N.W.2d 63 (1981).

*New Jersey.* This act applies only to a franchise which contemplates or requires that the franchisee establish or maintain a place of business in New Jersey (NJSA 56:10–4), and the term "place of business" shall not mean an office, a warehouse, a place of storage or a vehicle, (NJSA 56:10–3 f). Darche had its sales office in New Jersey, but nothing in the contract contemplated or required that location; it could have been anywhere in or outside its territory. Even if it was so contemplated or required, the Act would not apply because an "office" is not a "place of business."

*Delaware.* This law applies to "franchised distributors" who have a place of business in Delaware, and who either purchase or take goods on consignment, or sell products through retail outlets, 6 Del.Code.Ann. § 2551. It does not apply here.

*New Hampshire.* This statute applies only to situations where the distributor or franchisee is required to pay a fee to acquire the franchise, N.H.Stat. 358–E:1. While Darche earned commissions on orders it solicited that were accepted by Charmglow, there is no suggestion that it was ever called upon to pay a fee to acquire a franchise. This Act does not apply.

*Rhode Island.* The statute here is like New Hampshire's in requiring a fee component. R.I.Stat. 19–28–3(c)(3). It does not apply.

*Illinois.* This statute, like New Hampshire and Rhode Island, applies only when a fee is paid for the franchise, Ill. ch. 121½, § 703(1)(c). It does not govern here.

*Connecticut.* This statute applies only if the franchisee is granted the right to offer, sell or distribute the products involved, Conn.Stat. § 42–133e(b)(1). Under the contract, Darche, as an independent contractor, could not "offer" since an acceptance of an offer by a customer would give rise to a contract which it could not make. It had no right to "sell". It had no right to "distribute". Its sole function was the "solicitation of orders," which are offers to buy, for acceptance by Charmglow. There was no "franchise" under this statute.

*Maine, Massachusetts, Pennsylvania, Vermont* and *New York.* No statutes from these States were included in the post-hearing submission and the court takes it that there are none.

In sum, no statute has been found in any State within the Darche territory which purports to apply to this contractual relationship in any way that would preclude Charmglow's exercise of the mutual right to cancel on 60 days' advance written notice of such cancellation.

During the colloquy on the motion, the court explored the question whether, if such statutes did apply, termination could be limited to grounds listed in the statute, especially since the specified grounds tend to be quite narrow. The product may be barred by a regulatory agency; its sale may become illegal; the franchisor may be unable to meet the competition; the franchisor may decide to go out of business and liquidate, the franchisor may die, and so on. It is unlikely that any of these, or other like grounds, will be found in any reported cases because they are of a kind where there is

nothing left to sell, whether by the franchisor or the franchisee, and thus the subject matter of the franchise ceases to exist. The point, while interesting, need not be decided in view of the ruling made.

■ The final point pressed by Darche is that cancellation on a 60-day notice breaches an implied covenant of good faith and fair dealing, citing *Bak-A-Lum v. Alcoa, etc.*, 69 N.J. 123, 351 A.2d 349 (1976). That case, or others like it, does not apply here. In *Bak-A-Lum*, there was an oral agreement for exclusive distribution of the product in Northern New Jersey and, after the franchisor had unilaterally decided (without disclosure) to terminate the distributorship it encouraged the distributor to expand its efforts and order $150,000 of additional product for inventory. Some 6 months later, the agreement was terminated. The court ruled that while the agreement could be terminated, the circumstances called for notice of not less than 20 months to enable the distributor to work off its inventory.

Nothing of that nature appears here. There was no inventory. Darche undertook no activity to expand. It served the same function of soliciting orders as before. It was free to act as manufacturer's representative for others, so that its employees could solicit orders for product lines other than Charmglow's. It was aware that either side could cancel on 60 days' advance written notice. It was aware that Charmglow could add or remove items from the product line, alter prices (on which commissions were figured), and change commission schedules from time to time.

In sum, the facts not in dispute establish that the relationship was not a "franchise" of the kind regulated as to termination by the statutes of any of the States comprising the Darche territory, nor is there any fact presented to suggest a genuine issue of material fact to support the theory that any implied obligation of good faith and fair dealing was breached. Darche knew, from the July 30, 1979 sales meeting, of the significant change in marketing policy as well as of the sharp reduction in commissions. It also knew from that time of the expectation that all manufacturer's representatives would be out of the picture within the year.

Given these facts, not in dispute, and the applicable law, defendant is entitled to judgment as a matter of law. Submit order accordingly.

## APPENDIX

### Economics and Useful Arts

### THE WHOLESALING STRUCTURE

Social circumstances affect first that level of marketing practice which directly serves society, namely, retailing. Changes in retailing and in the retailing system in turn affect wholesaling practice and wholesaling establishments.

Whereas in retailing the character of marketing establishments is determined almost wholly by decisions made locally within those establishments, in wholesaling their character is the effect of the joint and/or separate decisions of producers and wholesale middlemen. Between them occurs such a play of integration and specialization of activities, whereby the functions inherent in a given market situation are divided, that a producer's assumption of wholesaling functions is usually attended by a corresponding reduction in wholesaling functions performed by independent wholesale middlemen. This process whereby functions of wholesaling sometimes performed by wholesale middlemen are shifted backwards or forwards in the distributive channel is termed *circumvention*, indicating a tendency to "go around" but signifying management decisions making a new allocation of the functions involved.

The performance of wholesaling occurs in three stages representing degrees of specialization and integration: 1), producers performing the entire function of wholesaling involved in the distribution of their goods; 2), producer-owned marketing establishments physically separate from the production facilities; 3), independent wholesale undertakings representing complete separation of production and marketing functions.

**Channels.** In a market as large and diversified as that of the United States, competitive initiative has produced a variety of combinations of marketing establishments involved in the performance of the functions. These combinations are called "channels" for the flows of various elements. Some handle the flow of products, others the flows of title, information, payments, service, and the like.

The circumstances of the market—of the buyer, of the seller, and of the product—prescribe the functions which must be performed. Differences in market situations result in a variety of channels functioning side by side, even in the same line or trade. Dissimilar channels are also found serving in *identical* market situations, as a result of differences in competitive strategy and efficiency.

Wholesaling components of vertical channels include both *wholesale middlemen* and *other wholesale establishments.* They range from those establishments performing a minimum of functions (such as brokers and drop shippers) through those middlemen performing a wide range of functions (such as the selling agent and the regular wholesaler) to producers' own distributive outlets, with or without stocks.

The regular wholesaler represents a full combination of marketing functions; other establishments represent a lesser combination, and therefore a relegation of residual functions to other buyers and sellers in the channel.

In the channels for manufactured products, the following are the principal establishments and their functions:

## I. LIMITED FUNCTION MIDDLEMEN

a) Not taking title.

1) *Brokers.* One of the most highly specialized independent middlemen is the broker, whose almost sole function is representation of buyers and sellers in negotiations. He does not take title, handle goods, render financial assistance, or determine the sale price. He is engaged either by buyers or sellers on a temporary basis and is paid a commission for his service. He is most useful in the sale of highly standardized goods, particularly of a seasonal nature, and in negotiating between widely scattered buyers and sellers.

2) *Commission Merchants.* Commission merchants also do not take title, but, in addition to the negotiatory functions of the broker, they may handle, or temporarily store commodities, and on occasion render financial assistance to buyers. They serve mainly in distribution of grocery specialties, and in the wholesale marketing of dry goods.

b) Taking title.

1) *Drop Shippers.* Buying, selling, and financing of marketing are the principal functions of drop shippers, who do not handle physically the commodities they sell. They deal primarily in the distribution of bulky products bought in large quantities.

2) *Cash and Carry Wholesalers.* Buying, selling, and storing are the main functions of cash and carry wholesalers, who omit delivery and marketing financing.

3) *Wagon Distributors.* Simultaneous sale and delivery are the chief functions of the wagon distributor, who omits storage and financing in the limited line of specialty items which he carries.

## II. FULL FUNCTION ESTABLISHMENTS

a) Not taking title.

1) *Manufacturers' Representatives.* Manufacturers' representatives are, with selling agents, one of the two types of functional middlemen who maintain continuous contractual relations with producers whom they represent. They sell, handle products, and provide market information, but they do not buy, render financial assistance, select the market in which they sell, or determine the selling price. They serve the principal in the manner and place of his determination. This middleman is employed by producers needing economical sales assistance in selling a narrow line of products in sparce, scattered, distant, or new markets.

2) *Selling Agents.* Selling agents are independent, multiple-line establishments

substituting for a manufacturer's own sales organization. They may perform all functions except buying. Handling the producer's entire output, they sell, store, finance, gather market information, determine price and territory. Combining the product with non-competing lines of other producers, particularly in the field of textiles but also in other lines, they serve manufacturers who are least able or willing to perform any of the marketing functions themselves.

b) Taking title.

1) *Regular Wholesalers.* Independent merchant wholesalers perform in some channels the dual processes of assembly and disposition. They are most useful in distributing products which, for efficiency and economy, must be gathered from many sources and distributed to many outlets and buyers. They take title, buy, sell, store, break bulk, deliver, and both gather and disseminate market information. When handling manufactured goods intended for the household consumer market, this middleman is called a wholesaler; when handling products for the industrial or institutional market, he is known as an industrial distributor. Regular wholesalers provide economical distribution for a great number of related products.