60 Cal.App.4th 1294 (1998)
GENE GENTIS et al., Plaintiffs and Respondents,
v.
SAFEGUARD BUSINESS SYSTEMS, INC., et al., Defendants and Appellants.
Docket No. B110351.
Court of Appeals of California, Second District, Division Five.
January 20, 1998.
*1296 COUNSEL
Schiff, Hardin & Waite, Paula J. Morency, Jeffrey J. Bushofsky, Jackson, Tufts, Cole & Black, Gerald Z. Marer, Mayer, Brown & Platt, Lee N. Abrams, James C. Schroeder and Jacqueline R. Brady for Defendants and Appellants.
Stanbury & Fishelman, Bruce C. Fishelman, George Stanbury and Alec B. Wisner for Plaintiffs and Respondents.
OPINION
TURNER, P.J. 

I. INTRODUCTION
Defendants, San Jacinto Holdings, Inc., and its wholly owned subsidiary, Safeguard Business Systems, Inc. (Safeguard), appeal from a judgment. The judgment declared Safeguard to be a franchisor under the California *1297 Franchise Investment Law (CFIL), Corporations Code section 31000 et seq.[1] Safeguard manufactures and sells recordkeeping systems and office products. The plaintiffs are members of a class of Safeguard's current and former distributors. Safeguard contends the facts as found by the trial court were insufficient as a matter of law to meet the statutory requirement that plaintiffs were "granted the right to engage in the business of offering, selling or distributing goods or services. ..." (§ 31005, subd. (a)(1), italics added.) The parties do not dispute the trial court's factual findings. The sole issue raised on defendants' appeal is that the trial court's factual findings as a matter of law do not permit a conclusion that a franchise relationship within the meaning of the CFIL existed between the parties. Safeguard argues that because plaintiffs lacked the authority to enter into binding sales contracts, did not transfer title to goods, and did not regularly deliver products to customers, they could not be franchisees within the meaning of the CFIL. We disagree. Accordingly, we affirm the judgment.

II. DISCUSSION

A. Definition of a Franchise

The CFIL defines a franchise in section 31005. The statute provides, in pertinent part: "(a) `Franchise' means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: [¶] (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and [¶] (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and [¶] (3) The franchisee is required to pay, directly or indirectly, a franchise fee." (§ 31005, italics added.)
(1a) Safeguard does not dispute the court's findings that: plaintiffs operated "under a marketing plan or system prescribed in substantial part by" Safeguard; plaintiffs' operation of their businesses "pursuant to such plan or system [was] substantially associated with [Safeguard's] trademark, service mark, trade name, logotype, advertising or other commercial symbol designating [Safeguard] or its affiliate"; and plaintiffs were required to pay a franchise fee. (§ 31005, subd. (a).) The focus of defendants' argument is narrow. They point to the "offering, selling or distributing goods or services" language of subdivision (a)(1) of section 31005, a portion of the marketing plan or system prong of the statute. Defendants contend the trial court erred as a matter of law in holding Safeguard was a franchisor under the CFIL *1298 because persons who solicit orders, but lack the authority to enter into binding sales contracts, do not offer, sell or distribute goods or services. Plaintiffs concede they cannot enter into binding contracts or pass title to goods. Nevertheless, they assert, the trial court properly determined they were franchisees. We agree.
Neither the CFIL, which protects consumers in the sale of franchises, nor the California Franchise Relations Act (CFRA) (Bus. & Prof. Code, § 20000 et seq.), which regulates certain events after the franchise relationship has been formed, defines the phrase "offering, selling or distributing goods or services." We have not found any decision of the Commissioner of Corporations which sheds any light on the issue now before us. Further, we have not found any pertinent decisional authority interpreting the statutory phrase "offering, selling or distributing goods or services" as used in the CFIL or the CFRA.[2]
(2) Citing well-established rules of statutory interpretation, the Court of Appeal discussed judicial construction of the CFIL in Kim v. Servosnax, Inc. (1992) 10 Cal. App.4th 1346, 1355-1356 [13 Cal. Rptr.2d 422] as follows: "Our job in determining the meaning of [the CFIL] starts with ascertaining the intent of the Legislature so as to effect the purpose of the law and construe the statute with reference to the entire law of which it is a part. [Citation.] In enacting the [CFIL], the Legislature declared its concern for protecting prospective franchisees and expressed its intent to prevent franchise sales where it is likely that the franchisor's promises would not be fulfilled. [Citations.] [¶] As a general matter, remedial or protective statutes such as the [CFIL] are liberally construed to effect their object and quell the mischief at which they are directed. [Citations.] With regard to the statutory definition of `franchise,' this means each element should be construed liberally to broaden the group of investors protected by the law and to carry out the legislative intent." (Fn. omitted.)
*1299 The Legislature expressed the intent of the CFIL in section 31001 as follows: "The Legislature hereby finds and declares that the widespread sale of franchises is a relatively new form of business which has created numerous problems both from an investment and a business point of view in the State of California. Prior to the enactment of this division, the sale of franchises was regulated only to the limited extent to which the Corporate Securities Law of 1968 applied to such transactions. California franchisees have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between franchisor and franchisee, and the prior business experience of the franchisor. [¶] It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship."
The legislative history of section 31005 reveals great care was taken in defining a "franchise" because of the countless and varied relationships that could qualify as such. The CFIL was jointly sponsored by the Attorney General and the Commissioner of Corporations. It was a part of former Governor Ronald Reagan's 1970 "Consumer Program." In an article, which was before legislative committees, published in September 1969, the Commissioner of Corporations, Anthony R. Pierno, discussed the need for legislation protecting individuals from the loss of their investments in franchises due to causes ranging from outright fraud to simple incompetence. (Pierno, Franchise Regulation  The Need for a New Approach (Sept. 1969) L.A. Bar Bull., p. 501 et seq.) With respect to the definition of a franchise, Commissioner Pierno observed: "One problem that will run through any attempt to draft appropriate legislation to deal with franchises is that of definition. The definition which will be most difficult to devise will be the first one, that of what constitutes a `franchise[.'] While in a typical drafting situation such as that involved in the preparation of the Corporation Securities Law of 1968 the concern in defining a word or phrase is whether something has been overlooked, it appears that this situation will be unique. In attempting to define the term `franchise[,'] which has been in use for so many years and covers so many different concepts, the concern will have to be that many things are not being included which would clearly be excluded if the draftsmen were consciously aware of their existence and of their denomination as franchises. For example, many marketers who offer goods to retailers describe the `right' granted the retailer to sell those goods as a `franchise[,'] *1300 even though in many instances the relationship has none of the characteristics of a franchise as it is most commonly used in the situations under discussion in this article. The retailer may be under no obligation to purchase goods exclusively from the manufacturer or in any minimum quantity; he pays no percentage of his gross to the manufacturer; he buys the inventory at the manufacturer's usual wholesale cost and resells it to the public, assuming the risk of any gain or loss on those sales. He has normal recourse against the manufacturer for defective merchandise but has no call upon the manufacturer for support by way of advertising, training, etc., such as a franchisee might have against his franchisor. In effect, even though the relationship is labeled `franchise' by the parties, nothing takes place between them except the sale and resale of merchandise. At the other extreme is the complex relationship seen in many of the fast food franchise systems presently in vogue. [¶] The foregoing simple example only begins to indicate the scope of the definition problem. There are countless variations and gradations between the extremes which will necessitate great care in drawing lines." (Id. at pp. 534-535.) In a March 30, 1970, statement before the Small Business Committee of the Senate Subcommittee on Urban and Rural Economic Development, the author of the CFIL, Senator Clark L. Bradley, stated: "We spent more time on [the section defining a franchise] than on any other single section of the bill. We decided that even though it may not be a perfect definition, that it is certainly adequate in light of the difficulty in defining `franchise.'"
(1b) We turn to the words of the statute as enacted by the Legislature, giving the language its usual, ordinary meaning. (Kimmel v. Goland (1990) 51 Cal.3d 202, 208-209 [271 Cal. Rptr. 191, 793 P.2d 524]; Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal. Rptr. 67, 743 P.2d 1323].) Significantly, the statutory language at issue is stated in the disjunctive: "offering, selling or distributing goods or services." (§ 31005, subd. (a)(1), italics added.) By using the word "or," the Legislature intentionally broadened the scope of the statute. (Mercer v. Department of Motor Vehicles (1991) 53 Cal.3d 753, 763-764 [280 Cal. Rptr. 745, 809 P.2d 404]; Burge v. City & County of San Francisco (1953) 41 Cal.2d 608, 616 [262 P.2d 6].) The double use of the disjunctive recognizes a distinction between: offering goods; selling goods; distributing goods; offering services; selling services; and distributing services. (Cf. Mercer v. Department of Motor Vehicles, supra, 53 Cal.3d at pp. 763-764; People v. Smith (1955) 44 Cal.2d 77, 78 [279 P.2d 33].) It evidences an intention to "designate alternative or separate categories." (White v. County of Sacramento (1982) 31 Cal.3d 676, 680 [183 Cal. Rptr. 520, 646 P.2d 191]; St. Cyr v. Workers' Comp. Appeals Bd. (1987) 196 Cal. App.3d 468, 472 [243 Cal. Rptr. 1].)
*1301 The usual, ordinary meaning of "offering" is: "the act of making an offer" (Webster's New World Dict. (3d college ed. 1991) p. 941), "the act of one who offers" or "something offered for sale." (Webster's New Collegiate Dict. (10th ed. 1995) p. 807.) "Offer" is defined, inter alia, as "to bring before, present, show," or "to present for consideration; suggest; propose." (Webster's New World Dict., supra, p. 940.) It is synonymous with extend, present, proffer, tender, afford, or provide. (Roget's II: The New Thesaurus (1984) p. 320.) The usual, ordinary meaning of "distribute" or "distributing" is "to give out or deliver." (Webster's New Collegiate Dict., supra, p. 338.) It is synonymous with disburse, dispense, or dole out. (Roget's II: The New Thesaurus, supra, p. 142.)

B. The Relationship Between Plaintiffs and Safeguard Constituted a Franchise

The distributor agreements between plaintiffs and Safeguard contained provisions requiring plaintiffs to use their best efforts to: actively solicit orders; install Safeguard systems; follow up on leads and referrals provided by Safeguard; and maintain periodic contact and provide ongoing service to customers. All orders were subject to acceptance by Safeguard. Prices and terms were set by Safeguard. Safeguard billed the customers. The customers submitted payment directly to Safeguard which assumed sole responsibility for collecting accounts. With respect to the "offering, selling or distributing goods or services" language of the CFIL, the trial court found: "The distributors of Safeguard products were more than just `order takers.' The testimony of several distributors provided a picture of independent business persons. Each distributor was obligated to, and did, establish its own place of business. When one became a distributor, one also received a list of prior customers. Each distributor was expected to contact the customers on the original list and to add to the list by contacting and soliciting orders from businesses within their geographic area. The recruitment was all done at the expense and on the time of the distributor. Customers were called on, products were demonstrated, problems were solved and orders were written. In certain circumstances the distributors also guaranteed the payments of their customers. Most orders were approved by Safeguard prior to shipment. [¶] One distributor testified that on occasion he had picked up goods at the delivery point and had personally delivered the goods to the customer. The practice of distributors picking up goods at the distributor center was confirmed by Safeguard's witness who testified that it was done on a small percentage of orders. On other occasions, goods were shipped to the distribtor's office and picked up by the customer. Participants in the Brokerage *1302 Program[[3]] actually guaranteed the payment of the bill for their customers if they did not collect payment in full at the time of the order. [¶] Retail prices were not always set by Safeguard. On certain products, including computer forms, the distributor set the price to the customer. Safeguard provided a minimum price and the distributor set the price higher to provide for its commission. One witness testified that as a distributor he also maintained a small inventory of products at his place of business. [¶] The distributors were more than `order takers.'"
Liberally construed (Kim v. Servosnax, Inc., supra, 10 Cal. App.4th at p. 1356), the language "offering, selling or distributing goods or services" (§ 31005, subd. (a)(1)) encompassed the arrangement at issue here as found to exist by the trial court. Plaintiffs offered Safeguard's goods for sale to customers by: contacting existing customers and recruiting new business; calling on customers; demonstrating products; installing Safeguard systems; solving customer problems; providing ongoing service; and soliciting orders for goods subject to Safeguard's approval. By presenting and demonstrating its products, installing its systems, and providing ongoing service, plaintiffs ensured the distribution and sale of Safeguard's goods. An integral part of their function was to offer Safeguard's goods and services to customers. Plaintiffs participated in the direct distribution of Safeguard's goods by, on occasion, picking products up and delivering them to customers. Also, plaintiffs received goods from Safeguard to be picked up by customers.
Defendants cite decisional authority from other jurisdictions in support of their contention Safeguard is not a franchisor because plaintiffs: were authorized to solicit orders for goods at prices set by Safeguard, but lacked the authority to enter into binding sales contracts; did not maintain any inventory; did not pass title to products; did not bill customers; and did not ordinarily deliver goods to customers. Several of those decisions hold there is no right to sell goods or services absent authority to enter into a binding contract. (E.g., Vitkauskas v. State Farm Mut. Auto. Ins. (1987) 157 Ill. App.3d 317 [109 Ill.Dec 373, 509 N.E.2d 1385, 1391] [plaintiff did not "sell" insurance within the meaning of the Illinois Franchise Disclosure Act where he could not commit the defendant to a binding contract of insurance]; Foerster, Inc. v. Atlas Metal Parts Co. (1981) 105 Wis.2d 17 [313 N.W.2d 60, 64] [plaintiff had no right to "sell" within the meaning of the Wisconsin Fair Dealership Law, involving the "right to sell or distribute goods or services," where it did not have the authority to commit the grantor to a *1303 sale].) Those cases did not address the right to offer or distribute goods or services. As discussed above, the CFIL defines a franchisee as one "granted the right to engage in the business of offering, selling or distributing goods or services...." (§ 31005, subd. (a)(1), italics added.)
Another decision cited by defendants, E.A. Dickinson, etc. v. Simpson Elec. Co. (E.D.Wis. 1981) 509 F. Supp. 1241, 1244-1245, construed "selling" and "distributing" within the meaning of the Wisconsin Fair Dealership Law, but did not consider "offering" goods or services because that language was not included in the statute. E.A. Dickinson, etc. held the plaintiff was not granted the right to sell the defendant's goods where the plaintiff: did not take title to or possession of any goods; did not deliver goods to third parties; and did not exchange goods for a price with any third party. (Id. at p. 1245.) The court also concluded the plaintiff did not distribute any goods "since it has none in its possession." (Ibid.) By contrast, in the present case, the trial court found that on occasion plaintiffs took possession of defendants' goods for delivery to customers. Hence, E.A. Dickinson, etc. is not persuasive authority. In George R. Darche Associates v. Beatrice Foods Co. (D.N.J. 1981) 538 F. Supp. 429, 434, affirmed (3d Cir.1982) 676 F.2d 685, also cited by defendants, the court construed a Connecticut statute. The United States District Court judge held: "This statute applies only if the franchisee is granted the right to offer, sell or distribute the products involved, Conn.Stat. § 42-133e(b)(1). Under the [present] contract, [plaintiff], as an independent contractor, could not `offer' since an acceptance of an offer by a customer would give rise to a contract which it could not make. It had no right to `sell'. It had no right to `distribute'. Its sole function was the `solicitation of orders,' which are offers to buy, for acceptance by [the manufacturer defendant]. There was no `franchise' under this statute." (George R. Darche Associates v. Beatrice Foods Co., supra, 538 F. Supp. at p. 434.) We disagree with the district court insofar as its opinion interpreted the Connecticut statute to mean that to offer goods necessarily requires the power to enter into a binding contract. To so hold in the context of the CFIL, section 31005, subdivision (a)(1), would narrow rather than expand the scope of the California statute, contrary to the Legislature's intent as expressed by the use of the disjunctive, "offering, selling or distributing." (Mercer v. Department of Motor Vehicles, supra, 53 Cal.3d at pp. 763-764; White v. County of Sacramento, supra, 31 Cal.3d at p. 680; Burge v. City & County of San Francisco, supra, 41 Cal.2d at p. 616.) We do not conclude "offering" and "selling" mean the same thing in this context. Neither the language of section 31005, subdivision (a)(1), nor the legislative history of the CFIL, demonstrates an intent to limit its reach to situations in which the franchisee: has authority to bind the franchisor to a sale of goods; passes title to products; and regularly delivers products to customers.
*1304 We recognize that commentators have distinguished between franchisees and sales representatives. For example, in Garner's Franchise and Distribution Law and Practice (1990) section 1.31, pages 30-31, the author distinguished a manufacturer's representative from a franchisee as follows: "Manufacturer's representatives are independent sales representatives who sell the products of one or more manufacturers. They generally are paid on a commission basis, although arrangements may differ from company to company. These representatives usually make no investment in the business of distribution of the product, carry no inventory and have no warehouse or employees. Typically they cannot alter the terms on which the manufacturer offers the products for sale, and they do not have authority to close sales. Similarly, manufacturer's representatives do not take the risk of loss or of collection and do not receive reimbursement for travel or advertising expenses. They do not pay a fee for the right to sell the manufacturer's product and are not usually held to constitute franchises or dealerships." Similarly, in Brooks, When Does a Product Distribution System Become a Franchise or Business Opportunity? (Oct. 1991) American Bar Association Forum on Franchising, pages 3965-3966, the author states: "A network of sales representatives assigned to geographic territories and subject to minimum sales quotas, who solicit orders but lack the authority to commit the grantor to a sale, is a distribution arrangement that appears to lie outside of franchise and business opportunity regulation. This arrangement differs from franchised distributorships in that the manufacturer retains the right to accept or reject the orders brought in by the representative. Further, the manufacturer retains title to and possession of goods, sets prices, makes credit decisions, and retains responsibility for shipping and collection. The representative solicits orders, but cannot commit to a sale. The right to sell another's goods and possession of entrepreneurial responsibility distinguishes a franchised distributorship from a sales network." Indeed, the California Legislature, along with half the states,[4] has enacted an act governing the relationship between manufacturers and wholesale sales representatives. (Independent Wholesale Sales Representatives Contractual Relations Act of 1990, Civ. Code, § 1738.10 et seq.) The Legislature intended "to provide security and clarify the contractual relations between manufacturers and their nonemployee sales representatives." (Civ. Code, § 1738.10.)
In the present case, however, the court found plaintiffs were more than sales representatives who simply solicited orders without authority to bind Safeguard. Plaintiffs operated independent businesses through which, in addition to soliciting orders, they demonstrated products, solved customer problems, installed Safeguard systems, maintained contact with existing *1305 customers, generated new business, and provided ongoing service to customers. On occasion, they participated directly in the distribution of Safeguard's goods. In some circumstances, they guaranteed customer payment. They set prices on certain products. Further, the court found: plaintiffs were operating under a marketing plan or system prescribed in substantial part by Safeguard; the operation of their businesses pursuant to such plan or system was substantially associated with Safeguard's trademark, service mark, trade name, logotype, advertising or other commercial symbol; and plaintiffs were required to pay a franchise fee. (§ 31005, subd. (a).) Hence the relationship before us, as found to exist by the trial court, was not simply that of a manufacturer and a nonemployee sales representative.

C. No Compelling Public Policy Reasons Persuade Us to Depart From the Usual Rule of Retroactive Application

(3a) Safeguard argues the ruling in this case should be applied prospectively only because an "unbroken line of precedent" has held the present arrangement does not constitute a franchise. Safeguard asserts it relied on this existing precedent in structuring its relationship with the plaintiffs. We find no compelling public policy reasons that persuade us to depart from the usual rule of retroactive application of judicial decisions. (4) The rule that judicial decisions are generally applied retroactively is well established. (Camper v. Workers' Comp. Appeals Bd. (1992) 3 Cal.4th 679, 688 [12 Cal. Rptr.2d 101, 836 P.2d 888]; Droeger v. Friedman, Sloan & Ross (1991) 54 Cal.3d 26, 45 [283 Cal. Rptr. 584, 812 P.2d 931]; Woods v. Young (1991) 53 Cal.3d 315, 330 [279 Cal. Rptr. 613, 807 P.2d 455]; Estate of Propst (1990) 50 Cal.3d 448, 462 [268 Cal. Rptr. 114, 788 P.2d 628]; Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 978 [258 Cal. Rptr. 592, 772 P.2d 1059].) The rule is "basic in our legal tradition." (Newman v. Emerson Radio Corp., supra, 48 Cal.3d at p. 978; Droeger v. Friedman, Sloan & Ross, supra, 54 Cal.3d at p. 45.) However, the rule is not absolute. (Camper v. Workers' Comp. Appeals Bd., supra, 3 Cal.4th at p. 688; Woods v. Young, supra, 53 Cal.3d at p. 330.) It is subject to two narrow exceptions, based on considerations of fairness and public policy. (Camper v. Workers' Comp. Appeals Bd., supra, 3 Cal.4th at p. 688; Droeger v. Friedman, Sloan & Ross, supra, 54 Cal.3d at p. 45; Estate of Propst, supra, 50 Cal.3d at p. 462; Newman v. Emerson Radio Corp., supra, 48 Cal.3d at p. 983.) The Supreme Court has held: "A court may decline to follow the standard rule when retroactive application of a decision would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law." (Newman v. Emerson Radio Corp., supra, 48 Cal.3d at p. 983.) The California Supreme Court has noted: "`A decision *1306 announcing a change in a judicial rule of law is rarely, if ever, a basis for disturbing a final judgment based on the prior rule. [Citations.] Nor will the new decision be applied to impair contracts made or property rights acquired in accordance with the prior rule. [Citations.]' [Citation.] A decision announces a new rule of law, for example, when it disapproves of a long-standing and widespread practice expressly approved by a near-unanimous body of lower court authorities. [Citation.]" (Droeger v. Friedman, Sloan & Ross, supra, 54 Cal.3d at p. 45.) The Supreme Court has identified the following as factors in determining whether to accord retroactive application to a judicial decision: "Several factors are relevant in determining whether an exception to the general rule of retroactivity is warranted, including: `the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule. [Citations.]' [Citation.]" (Camper v. Workers' Comp. Appeals Bd., supra, 3 Cal.4th at p. 688.)
(3b) The present decision does not announce a new rule of law. It does not overrule or disagree with any unanimous and unquestioned body of California decisional authority. Defendants concede there is no decisional authority in California addressing the issue presented in this case. Therefore, defendants could not have relied, reasonably or otherwise, on any established body of California decisional authority. (Cf. Woods v. Young, supra, 53 Cal.3d at p. 330 [seven Court of Appeal opinions found billing occurred under specified circumstances]; Li v. Yellow Cab Co. (1975) 13 Cal.3d 804, 829 [119 Cal. Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] ["very substantial number" of cases already tried using absolute defense of contributory negligence warranted rule of limited retroactivity].) Defendants have not cited any authority for the proposition retroactive application of a decision interpreting a California statute is unwarranted when the parties have relied on decisional authority from foreign jurisdictions interpreting other states' statutes. California courts are not bound by decisions in other jurisdictions, nor is the Legislature compelled to respond to such out-of-state opinions.
Even if defendants could justifiably rely on authority from other jurisdictions, they have not established the existence of an unbroken line of precedent mandating a finding the relationship at issue is not a franchise. Some of the decisional authority on which they rely construed statutes in other jurisdictions the language of which differs from that of the CFIL. For example, defendants rely in part on several cases decided under the Wisconsin Fair Dealership Law (WFDL) (Wis. Stat. § 135.02). (Sales & Marketing Associates, Inc. v. Huffy Corp. (7th Cir.1995) 57 F.3d 602, 607; John Maye Co., Inc. v. Nordson Corp. (7th Cir.1992) 959 F.2d 1402, 1406; Kornacki v. *1307 Norton Performance Plastics (7th Cir.1992) 956 F.2d 129, 131-132.) The WFDL defines a "dealer" as "a person who is a grantee of a dealership in this state." (Wis. Stat. § 135.02(2).) The WFDL defines a "dealership" as a "contract or agreement ... between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services...." (Wis. Stat. § 135.02(3).) The WFDL does not include the right to offer goods or services within its definition of a franchise. Therefore, cases decided under the WFDL do not construe that term which is part of the CFIL.
In addition, absent established decisional authority, the CFIL recognizes, as a defense to a claim a business arrangement is a franchise, reasonable reliance on rules, orders, or opinions of the Commissioner of Corporations. Similarly, reasonable reliance on an Attorney General opinion may be asserted in response to an action brought under the CFIL. Pursuant to section 31511, "No provision of this law imposing any liability applies to any act done or omitted in good faith in conformity with any rule, form, order, or any written interpretive opinion of the commissioner, or any opinion of the Attorney General, notwithstanding that the rule, form, order, or written interpretive opinion may later be amended or rescinded or be determined by judicial or other authority to be invalid for any reason." Defendants could have sought an interpretive opinion from the Commissioner of Corporations or the Attorney General. (§ 31510.) There is no evidence they availed themselves of this opportunity. Further, there is no indication of any substantial number of pending cases involving the issue of the CFIL's application to facts similar to the present case. Therefore, retroactive application of this decision does not raise substantial concerns about its effects on the general administration of justice. (Estate of Propst, supra, 50 Cal.3d at p. 463, fn. 4.)

III. DISPOSITION
The judgment is affirmed. Plaintiffs, Gene Gentis et al., are to recover their costs on appeal, jointly and severally, from defendants San Jacinto Holdings, Inc., and Safeguard Business Systems, Inc.
Armstrong, J., and Jackson, J.,[*] concurred.
A petition for rehearing was denied on February 19, 1998, and the following opinion was then rendered:
*1308 THE COURT.[**]
Defendants' petition for rehearing or for modification of the opinion is denied. The attorney who filed the petition on defendants' behalf is not licensed to practice law in this state. Nor did that attorney request permission to appear as counsel pro hac vice in connection with the appeal or this rehearing petition. (Cal. Rules of Court, rule 983.) An attorney who is not an active member of the California State Bar, and who has not been granted permission to appear in a particular matter, may not represent a party in this state's courts. (Bus. & Prof. Code, § 6125; Birbrower, Montalbano, Condon & Frank v. Superior Court (1998) 17 Cal.4th 119, 127-135 [70 Cal. Rptr.2d 304, 949 P.2d 1].)
Further, in their briefs on appeal, defendants argued the facts as found by the trial court were insufficient as a matter of law to meet the statutory definition of a franchise. They did not assert the evidence was insufficient to support the trial court's factual findings. In their rehearing petition defendants argue, for the first time, that the trial court inaccurately characterized some of the facts. They also specifically contend there was insufficient evidence to support one of the trial court's factual findings. It is well settled that arguments, including insufficiency of the evidence, cannot be raised for the first time in a petition for rehearing. (Conservatorship of Susan T. (1994) 8 Cal.4th 1005, 1013 [36 Cal. Rptr.2d 40, 884 P.2d 988]; County of Imperial v. McDougal (1977) 19 Cal.3d 505, 513 [138 Cal. Rptr. 472, 564 P.2d 14]; A.F. Estabrook Co. v. Industrial Acc. Com. (1918) 177 Cal. 767, 771 [177 P. 848]; Prince v. Hill (1915) 170 Cal. 192, 195 [149 P. 578]; San Francisco v. Pacific Bank (1891) 89 Cal. 23, 25 [26 P. 615]; Kellogg v. Cochran (1890) 87 Cal. 192, 200 [25 P. 677]; Payne & Dewey v. Treadwell (1860) 16 Cal. 220, 247; Akins v. State of California (1998) 61 Cal. App.4th 1, 39, [71 Cal. Rptr.2d 314]; Boydston v. Napa Sanitation Dist. (1990) 222 Cal. App.3d 1362, 1370 [272 Cal. Rptr. 458]; American Tobacco Co. v. Superior Court (1989) 208 Cal. App.3d 480, 490, fn. 6 [255 Cal. Rptr. 280]; Brown v. Superior Court (1982) 137 Cal. App.3d 778, 782 [187 Cal. Rptr. 324]; Rolley, Inc. v. Merle Norman Cosmetics (1954) 129 Cal. App.2d 844, 852 [278 P.2d 63]; Bradley v. Bradley (1949) 94 Cal. App.2d 310, 312 [210 P.2d 537, 211 P.2d 638].)
The balance of defendants' petition restates arguments that were raised and considered on appeal. We are satisfied with the correctness of our decision.
Appellants' petition for review by the Supreme Court was denied April 22, 1998.
NOTES
[1] All further statutory references are to the Corporations Code unless otherwise noted.
[2] In Lads Trucking Co. v. Sears, Roebuck and Co. (C.D.Cal. 1987) 666 F. Supp. 1418, 1420, the United States District Court for the Central District of California considered whether a franchise existed under the CFIL. The court concluded "[t]he essential elements needed to create a franchise do not exist" because: "The essence of the agreement is that Lads provides a delivery service for goods sold by Sears to its customers. [¶] Lads collects an assemblage of packages from Sears Distribution Center and performs the service of taking these packages to the persons to whom Sears has sold them. It ordinarily has no idea what goods are contained in the package and does not in any way warrant the quality of the contents to the customers. Any complaint em[a]nating from the customer would be addressed directly to Sears and the customer looks upon the delivery person as having had no participation in the contract of sale." (Ibid.) We read Lads as holding simply that a delivery service which has no participation in the contract of sale is not a franchisee within the meaning of the CFIL. The present case involves something other than a delivery service. Further, it is undisputed plaintiffs participated in contracts of sale, although they could not bind Safeguard. Therefore, Lads has little bearing on the issue presented in the present case.
[3] The trial court described the "Brokerage Program" as follows: "By this program [d]istributors were permitted to sell products that were not produced by Safeguard. If a customer wanted to buy a product that was not sold by Safeguard, the [d]istributorship was able to sell a product from an approved outside supplier. The exact terms of the program were contained in the Brokerage Products Addendum." (Fn. omitted.)
[4] See Garner, Franchise and Distribution Law and Practice (1997 cum. supp.) section 1.31, pages 3-4.
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[**] Before Turner, P.J., Armstrong, J., and Jackson, J.[]

[] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.