JAMES VITKAUSKAS, Plaintiff-Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.

Third District   No. 3—86—0576

Opinion filed June 29, 1987.

Block, Krockey, Cernugel & Cowgill, P.C., of Joliet (Joseph M. Cernugel, of counsel), for appellant.

Matkov, Griffin, Parsons, Salsman & Madoff, of Chicago (Ronald J. Hein, of counsel), for appellee.

JUSTICE SCOTT delivered the opinion of the court:

James Vitkauskas, plaintiff, filed a multicount complaint in which he sought damages against the defendant, State Farm Mutual Automobile Insurance Company. Counts I and II were predicated upon causes of action for breach of contract and wilful breach of contract. Counts III and IV attempted to allege a cause of action for intentional infliction of emotional distress and violation of the Illinois Franchise Disclosure Act (Ill. Rev. Stat. 1985, ch. 121½, par. 701 *et seq.*). The trial court denied plaintiff's motion for leave to file a count V alleging a breach of contract and wrongful discharge action predicated upon the same substantive allegations set forth in count I. The trial court ultimately dismissed the entire complaint with prejudice.

Accepting the well-pleaded facts alleged by the plaintiff, he began in 1978 to prepare himself to become an insurance agent for the defendant. He returned to college in 1978 and acquired a degree in 1982.

In count I of his complaint plaintiff specifically alleged as follows:

"On or about August 1, 1982, the Defendant, through its duly authorized agent, and the Plaintiff orally agreed that in consideration of the Plaintiff receiving 500 accounts, and in further consideration of the Plaintiff receiving adequate train-ing, instruction and assistance in the procuring of additional insurance business, that the parties would enter into a written agreement, a true and correct copy of which is attached hereto, marked as Exhibit A and by reference incorporated herein."

The plaintiff in count I alleged that the defendant breached the oral and written agreements in the following manner:

"a. Failed to provide the Plaintiff with 500 accounts;

b. Failed to provide the Plaintiff with adequate training and/or assistance in the procuring of insurance business;

c. Required Plaintiff to obtain more monthly applications than other trainees; which number was unreasonable by reason of the failure to provide an adequate number of accounts, training or assistance;

d. Failed to inform Plaintiff that he was being placed under the supervision of a district manager who was under scrutiny and investigation of an unusually high amount of losses, thereby jeopardizing the Plaintiff's employment; and

e. Failed to inform Plaintiff that notification of any breach as aforesaid to the management of the State Farm could result in the termination of his employment."

The plaintiff and defendant did enter into a written agreement on or about August 1, 1982, entitled "The State Farm Agency Building Plan Agreement." The defendant further provided to the plaintiff further printed material referred to as an outline designed to assist a trainee agent in understanding the provisions of the underlying building plan agreement. Reference to the provisions of the building plan agreement and the explanatory outline given to the plaintiff will be set forth as they become pertinent to the delineation of the issues raised by this appeal.

On June 22, 1983, the defendant notified the plaintiff that pursuant to termination provisions in the building plan agreement his relationship with the defendant company would terminate on June 30, 1983.

Count II of plaintiff's complaint alleged that defendant's alleged breaches of contract were committed wilfully and that he was entitled to damages. Count V, which the trial court would not permit to be filed, omitted any reference to oral agreements and alleged a breach of contract resulting in a wrongful discharge action, premised on some factual allegations as contained in count I.

In this appeal it is the contention of the plaintiff that the trial court's action in regard to all of counts I through V was improper. The trial court's rulings as to counts I, II and V are interrelated and will be addressed in conjunction with each other. In support of his assertion that the trial court acted incorrectly as to these counts, plaintiff argues that his employment contract, which we refer to as the building plan agreement, provided for a minimum employment period of 24 months.

Our examination of the building plan agreement fails to provide any contractual terms supportive of plaintiff's argument. On the con-

trary, we note that section XII,A of the building plan agreement specifically provides:

"Either party may terminate this Agreement by written notice delivered to the other or mailed to the other's last known address."

■ The reviewing courts of our State have uniformly held that an oral or written employment contract which does not specify duration is an "at will" employment contract, and may therefore be terminated for any reason or for no reason at all. *Lukasik v. Riddell, Inc.* (1983), 116 Ill. App. 3d 339, 452 N.E.2d 55; *Martin v. Federal Life Insurance Co.* (1982), 109 Ill. App. 3d 596, 440 N.E.2d 998.

■ Our courts have also uniformly held that an employment contract which provides termination "upon notice," such as we have in the instant case, creates a legal relationship of employment at will. *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 379 N.E.2d 765.

The building plan agreement bolsters our conclusion that the plaintiff was an employee at will when it is noted that in section XII,B of the agreement it provides, "In the event this Agreement remains in force during a minimum period of 24 months and the parties hereto execute a State Farm's Agent's Agreement ***." This language can only sensibly be interpreted to mean that there was no assurance of any minimum 24-month period of employment.

The plaintiff cites several cases in support of his contention that the building plan agreement provided for a specific duration period of employment. An examination of the same shows that they are all distinguishable and that plaintiff's reliance on them is misplaced. The plaintiff in his argument ignores the unambiguous and clear language contained in section XII,A of the agreement. The specific duration argument of the plaintiff is not persuasive.

■ The plaintiff asserts that oral promises were made to him by the defendant and also argues that certain promises were made in the printed material given to him for the purpose of assisting him in understanding the provisions of the building plan agreement. The instructive material provided to the plaintiff contained the following language:

"It has been the Company's experience that most Trainees will need at least *two years* to build a solid foundation upon which to become successful. Some Trainees may not be ready in *twenty-four* months because of various reasons, so we have a program which can be extended to provide income for a longer period if it is needed. Some of the things that might bring

about an extension of time would be: income not sufficiently developed, production not deemed reasonable with respect to potential available, reasonable qualification programs not met, quality concepts not fully acquired, or basic training school not completed. Our most sincere desire is to see you progress to the point that we can offer the State Farm Agent's Agreement to you." (Emphasis added)

An analysis of the foregoing language discloses that it explains the experience of the defendant company regarding trainees' performance and expresses the hope that they will do well. Standing alone, the language is barren of any contractual intent and stand alone it must. The language does not and cannot be interwoven with the building plan agreement, which provides as follows:

"XV. Sale Agreement.

This Agreement, upon its acceptance by Trainee as herein provided, shall supersede any prior agency or employment agreement between the parties hereto; and *** constitutes the sole entire agreement between the parties hereto ***."

Conversely, the instruction information given to the plaintiff also provided as follows:

"THE TRAINEE AGENT

PLEASE NOTE: The following outline is designed to assist you in understanding the provisions of the State Farm Agency Building Plan Agreement. In the use thereof, it should be clearly understood that the terms and conditions of the written agreement shall govern and control all questions of interpretation and construction. The written agreement constitutes the sole and entire agreement between the parties thereto."

Given the foregoing background, proof of the alleged oral promises is clearly barred by the parol evidence rule. Evidence of prior oral agreements is inadmissible to vary, alter or contradict a written agreement which is complete, unambiguous, valid and unaffected by fraud, duress, mistake or illegibility. *World Insurance Co. v. Smith* (1975), 28 Ill. App. 3d 1022, 329 N.E.2d 518.

■ As to attempting to alter or rewrite a contract by extrinsic evidence, such is not permitted. A case strikingly similar to the instant case is *Sullivan v. Massachusetts Mutual Life Insurance Co.* (9th Cir. 1979), 611 F.2d 261. In *Sullivan* the plaintiff's attempt to unilaterally alter the parties' agreement by imposing additional material obligations upon the company was rejected. We reach the same result, and affirm the trial court's dismissal of plaintiff's counts I and II and its denial of plaintiff's motion for leave to file count V.

We next direct our attention to count III of the plaintiff's complaint, which was also dismissed by the trial court. In this count plaintiff was seeking damages from the defendant based on the tort of outrageous conduct causing severe emotional distress. A fair summary of the plaintiff's allegations is that pursuant to discussions with defendant he entered a course of training and study with the aim of becoming an agent and by so doing he (plaintiff) abandoned all other career possibilities and opportunities. Plaintiff also alleged that in order to further his resolve to become an agent he returned to college to obtain a degree. Further, plaintiff alleged that prior to August 1982, at defendant's request he rendered services to defendant without being compensated. The plaintiff alleged that upon being hired by the defendant he was placed under the supervision of a manager with whom the defendant was dissatisfied and that as a result he, the plaintiff, was subjected to scrutiny and other employment pressures in excess of and different from those exerted upon similarly situated employees of the defendant. Plaintiff went on to allege that after being hired, the defendant failed to provide the instruction, training and financial assistance as promised. Lastly, the plaintiff contends that he was terminated for no reason related to his actions and that as a result he suffered severe and extreme emotional distress.

In determining the propriety of the trial court's action in regard to counts I, II and V, we have held that pursuant to the contractual agreement between the parties the defendant had the right to discharge plaintiff without cause. It could be argued that such right would preclude plaintiff from seeking recovery on the theory of infliction of severe emotional distress; however, counts I, II and V were predicated upon contractual theories and law. Count III is couched on tort law and because of this basic distinction we will consider plaintiff's argument that the trial court erred in finding that he failed to state a cause of action and that in any event what constitutes outrageous conduct is a question of fact to be resolved by a jury rather than by the court on a motion to dismiss.

■ Considering first the latter assertion of the plaintiff, we believe that it is clearly within the province of the court to decide whether facts alleged in a complaint can be considered so outrageous as to support a cause of action for intentional infliction of emotional distress. This court so held in *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373. See also *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137.

■ Directing our attention to the question as to whether or not count III stated a cause of action, it is noted that to state a cause of

action for intentional infliction of emotional distress, a plaintiff must allege facts establishing that (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant acted either intentionally to cause such distress or with knowledge of facts that would indicate such distress was substantially certain to result from its actions. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765.) The cited case also held that conduct giving rise to a cause of action for intentional infliction of severe emotional distress must extend beyond mere insults, indignities, threats, annoyances, petty oppressions or trivialities. 66 Ill. 2d 85, 89-90, 360 N.E.2d 765, 767.

■■ An examination of the cases discloses that our courts of review have been reluctant in allowing claims for intentional infliction of emotional distress relating to employment situations. *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137; *Morrison v. Sandell* (1983), 112 Ill. App. 3d 1057, 446 N.E.2d 290; *Palmateer v. International Harvester Co.* (1980), 85 Ill. App. 3d 50, 406 N.E.2d 595, *aff'd in relevant part, rev'd in part* (1981), 85 Ill. 2d 124, 421 N.E.2d 876; *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373.

We will not make an in-depth recitation of the facts presented in each of the foregoing cited cases. We do, however, make the observation that they clearly support a determination that the conduct complained of by the plaintiff in the instant case is not of such extreme and outrageous nature as to constitute a basis for recovery under the tort of intentional infliction of emotional distress.

We agree with the observations of Justice Buckley in the case of *Heying*, which are in part as follows:

"Personality conflicts, questioning of job performance and job transfers, whether for disciplinary or management purposes, are unavoidable aspects of employment. Frequently, they produce concern and distress for the affected employee. Yet, if the distress from such incidents was deemed so severe that no reasonable person could be expected to endure it, nearly all employees would have a cause of action for intentional infliction of severe emotional distress." *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 166, 466 N.E.2d 1137, 1144.

Given plaintiff's failure to plead essential elements of his cause of action in count III, we conclude that the trial court properly dismissed said count.

■■ ■ Lastly, the plaintiff argues that the trial court erred in dismissing count IV of his complaint. In this count the plaintiff alleged

that his relationship with the defendant was that of a "franchise" and that such relationship triggered the applicability of the Franchise Disclosure Act (Ill. Rev. Stat. 1985, ch. 121½, par. 701 *et seq.*). We will hereinafter refer to this Act as the IFDA.

The precise question as to whether one situated as the plaintiff is covered by the provisions of the IFDA has to our knowledge never been addressed and determined by the Illinois courts. The defendant cites decisions from sister States which have similar legislation in support of its argument that the IFDA is not applicable. We prefer not to rely on the decisions from foreign jurisdictions but instead will consider the contractual provisions entered into by the parties, the history of the IFDA, and the legislative intent at time of enactment, along with certain provisions of the IFDA.

At the outset we note that the explanatory material provided to plaintiff and entitled "The Trainee Agent" specifically provides:

> "During the period you are a Trainee you are an employee. \*\*\* Each of your activities in the early part of your career will be carefully guided by the company so that you learn to do them correctly and well."

This provision clearly states that plaintiff was to consider himself an employee and the IFDA was enacted to regulate the franchise industry and franchisees. Under the Act an employee and a franchisee are not synonymous. The plaintiff argues that this court should not be bound by "labels" which have been chosen to describe his relationship with the defendant. We agree that a dog does not become a cat by virtue of calling it a cat. In the instant case we do not have a simplistic dog and cat situation and hence we consider the label "employee" given to and accepted by the plaintiff as a factor having probative value in determining the correctness or incorrectness of the trial court's action in dismissing count IV.

The Act (IFDA) in relevant part provides as follows in its preamble:

> "Sec. 2. Findings and purpose.
>
> (1) The General Assembly finds and declares that the widespread sale of franchises is a relatively new business phenomenon which has created numerous problems in Illinois." Ill. Rev. Stat. 1985, ch. 121½, par. 702(1).

Representative Phillips, a co-sponsor of the bill which was enacted thereby creating the IFDA, in remarks before the House of Representatives sheds light on what the General Assembly meant by the phrase "relatively new business phenomenon." Representative Phillips stated as follows:

"The franchise method of doing business has grown by leaps and bounds. There are over ½ million franchise outlets in the United States doing over 90 billion dollars annually in sales. I'd like to give you a couple of examples. We have White Hen, which is a quick order food store, Duro-Clean, which is a carpet cleaning franchise, and of course, you're all familiar with McDonalds, the drive-in hamburger place, Arnold Palmer's, which, of course, is cleaners, and we could go on and on and on." 78th Ill. Gen Assem., House Proceedings, June 4, 1973, at 150-51.

It is evident from the Representative's remarks that the legislature was concerned with a new business which was sweeping the nation, to wit, the franchising business, which resulted in a new relationship, that of franchisor and franchisee. A reading of the Act (IFDA) discloses that it is primarily concerned with protecting the franchisee from being beguiled and misled into making investments for a franchise of a certain business without first having the information necessary to make an intelligent decision.

Businesses such as White Hen, Duro-Clean, McDonald's, Hardees, Holiday Inn, etc., are relatively new and have created a new business relationship, a different relationship from that of employer and employee, which has been *in esse* for centuries. It is impossible to conclude that the IFDA was intended to regulate the employer and employee relationship. The insurance industry has in fact been in business for centuries and it did not fall within the category designed to be protected by the IFDA.

It is further illuminating to analyze certain provisions of the Act. Specifically, we refer to a portion of section 3(1), which is as follows:

"Sec. 3. Definitions. As used in this Act:

(1) Franchise means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons by which:

(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and

(b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(c) the person granted the right to engage in such business

is required to pay, directly or indirectly, a franchise fee of $100 or more; ***." Ill. Rev. Stat. 1985, ch. 121½, par. 703(1).

The foregoing provisions set forth the elements of a franchise. Being stated in the conjunctive, if one element is not satisfied, then the franchise relationship is not satisfied. It is obvious that plaintiff has failed to satisfy sections 3(1)(a) and 3(1)(c).

It is obvious that plaintiff did not sell insurance. In the parlance of the industry, an employee is often referred to as an insurance salesman. The right to sell consists of an unqualified authorization to transfer a product at the point and moment of the agreement to sell or authority to commit a grantor to sell. The plaintiff did everything he could legally and responsibly do to effect a sale, but the sale could not be effective until approval of the defendant was forthcoming. Plaintiff could not commit the defendant to a binding contract of insurance. He could solicit an application for insurance, but he could not sell within the meaning of the IFDA.

Further, the plaintiff was not in compliance with section 3(1)(c) since he was not required to pay a franchise fee of $100 or more. A payment alleged to be a franchise fee must fit precisely within the statutory definition. *Kocjancich v. Bridges* (1981), 93 Ill. App. 3d 550, 417 N.E.2d 694.

The plaintiff's allegation that he provided some unstated "services" as well as unspecified "proceeds" to the defendant fails to satisfy the payment of a franchise fee requirement. Plaintiff failed to allege the value of the alleged services. In short, plaintiff's allegations concerning payment of a franchise fee are too vague and uncertain to be determined as fulfilling the fee requirement of the IFDA. The trial court properly dismissed count IV of the complaint.

For the reasons set forth, the judgment of the circuit court of Will County is affirmed.

Affirmed.

BARRY, P.J., and WOMBACHER, J., concur.