2010 Ark. 434

**Julia Carole GUNN, Appellant**

v.

**FARMERS INSURANCE EXCHANGE, Truck Insurance Exchange, Fire Insurance Exchange, Mid–Century Insurance Company, Farmers New World Life Insurance Company, Farmers Insurance Co., Inc., and Farmers Group, Inc., Appellees.**

No. 09–454.

Supreme Court of Arkansas.

Nov. 11, 2010.

Rehearing Denied Jan. 6, 2011.

Lundy, Lundy, Soileau & South, L.L.P., by: Jason M. Hatfield, Fayetteville, and Cullen & Co., PLLC, by: Tim Cullen, Tasha C. Taylor, and Andrew M. Taylor, Little Rock, for appellant.

Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., Little Rock, by: John K. Baker and Jeffrey L. Spillyards, Little Rock, for appellees.

ROBERT L. BROWN, Justice.

Appellant Julia Carole Gunn appeals from the circuit court's grant of summary judgment on all of her claims in favor of the appellees, Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid–Century Insurance Company, Farmers New World Life Insurance Company, and Farmers Insurance Company (collectively known as Farmers), and Farmers Group Incorporated (FGI). We affirm.

Before becoming an insurance agent for Farmers in 1980, Gunn worked in the office of her husband, who was also a Farmers insurance agent. When she and her husband divorced, she decided she wanted to become an insurance agent. There is some disagreement in the deposition testimony about whether Gunn approached Jerry Carter, who was a Farmers district manager, about becoming an agent or whether Carter recruited Gunn as an agent. In either event, Gunn did obtain her insurance agent's license and began working as a Farmers agent in Greenwood in 1980.[1]

On March 24, 1980, Gunn entered into an agreement (Agreement I) to accept appointment as a reserve agent with Farmers. On September 16, 1980, Gunn signed a second agreement (Agreement II) with Farmers, entitled Agent Appointment Agreement. She signed a third agreement (Agreement III) on August 25, 1991, also entitled Agent Appointment Agreement. Agreements II and III contain the same termination provision, paragraph C, which states:

> C. This Agreement terminates on the death of the Agent and may be terminated by either the Agent or [Farmers] on three (3) months written notice.
>
> If the provisions of this Agreement are breached by either the Agent or [Farmers], the Agreement may be terminated by the other party on thirty (30) days written notice. This Agreement may be terminated immediately by mutual consent or by [Farmers] for the following reasons:

---

1. Gunn was married to Carter for a few months in 1981.

1. Embezzlement of monies belonging to the Companies.
2. Switching insurance from the Companies to another carrier.
3. Abandonment of the Agency.
4. Conviction of a felony.
5. Willfull [sic] misrepresentation that is material to the operation of the Agency.

Gunn asserts that when she signed Agreement II in 1980, Carter assured her that she could be her own boss and create job security by building a profitable agency. She further claims that she expressed concern to Carter about the termination provision and that he assured her she need not worry about termination unless she committed one of the five enumerated breaches. Gunn asserts that she entered into Agreement II based on these assurances by Carter. Eleven years later, she signed Agreement III with the same termination provision and without requesting any additional information about the provision.

Carter was Gunn's district manager from 1980 to 2000. During those years, Carter stated that she ran a generally profitable agency. In 2001, Mike Wolfe became district manager. Gunn maintains that Wolfe began increasing demands on the agents by imposing quotas on them, which was not permitted by Farmers. She contends that Wolfe moved all of her 500 series policies to his girlfriend, who later became his wife. Those policies were transferred back to Gunn about a year later. Sometime around January 1, 2002, Farmers made changes to its policies that resulted in dramatic increases in the premiums charged to customers. According to Gunn, these changes led to a decline in her business. She notes, however, that she earned the maximum contract bonus that year and was inducted into the Farmers Walk of Fame around that time.

In June 2003, Gunn was placed on the Farmers' Deteriorating Agency Rehabilitation Program (DARG). She next received a letter, dated September 22, 2004, from Don Strum, a division marketing manager for Farmers, stating that Farmers was electing to terminate her contract, pursuant to paragraph C, effective December 27, 2004.

Gunn filed her complaint on November 27, 2007, in which she asserted four causes of action: Count I. Breach of contract and interference with contractual relationship or business expectancy; Count II. Misrepresentation, deceit, and outrage; Count III. Negligence;[2] and Count IV. Breach of the Arkansas Franchise Practices Act. Farmers moved for summary judgment on all counts, and after a hearing on the motion, the circuit court issued a letter summarizing findings on each count and granting the motion on all counts. The court's judgment was entered on March 2, 2009.

## I. *Standard of Review*

Gunn challenges the circuit court's grant of summary judgment on her contract claims and asserts that the termination provision in Agreements II and III are ambiguous and that she is entitled to protection under the Franchise Act. A trial court may grant summary judgment only when it is clear that there are no genuine issues of material fact to be litigated and that the party is entitled to judgment as a matter of law. *Harris v. City of Fort Smith*, 359 Ark. 355, 197 S.W.3d 461 (2004). Once the moving party has established a prima facie case showing entitlement to summary judgment, the opposing party must meet proof with proof and

**2.** Gunn has abandoned her negligence claim on appeal.

demonstrate the existence of a material issue of fact. *Young v. Gastro–Intestinal Ctr. Inc.*, 361 Ark. 209, 205 S.W.3d 741 (2005). On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Mitchell v. Lincoln*, 366 Ark. 592, 597, 237 S.W.3d 455, 458 (2006). This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.*

### II. *Contract Claims*

We will first address Gunn's contract claims. Gunn asserts that Farmers breached Agreement III and wrongfully terminated her. She urges that provision C of Agreement III, the termination provision, is ambiguous as to whether termination may be made only "with cause." Gunn's argument on this point has no merit.

To repeat, the provision at issue reads:

C. This Agreement terminates on the death of the Agent and may be terminated by either the Agent or [Farmers] on three (3) months written notice.

If the provisions of this Agreement are breached by either the Agent or [Farmers], the Agreement may be terminated by the other party on thirty (30) days written notice. This Agreement may be terminated immediately by mutual consent or by [Farmers] for the following reasons:

1. Embezzlement of monies belonging to the Companies.
2. Switching insurance from the companies to another carrier.
3. Abandonment of the Agency.
4. Conviction of a felony.
5. Willful [sic] misrepresentation that is material to the operation of the Agency.

As can be seen, there are three termination clauses. The first is a clause allowing termination without cause and permits termination by either the Agent or Farmers on three months' written notice. The second clause permits termination for breach of contract. Under that clause, the nonbreaching party may terminate on thirty days' written notice. There, finally, is a "for cause" clause which allows immediate termination if the agent engages in any of the five listed behaviors. Gunn's belief alone that the contract is ambiguous is not enough to make it so. The contract clearly provides three different ways an agent can be terminated with three different procedures. The procedures and reasons are not ambiguous in any sense and are easy to understand. Because of this, there is no reason for this court to resort to rules of construction to interpret this contract. *See Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 57 S.W.3d 165 (2001).

Gunn goes on to argue that even if her contract permitted termination for reasons other than the five-stated reasons, it does not permit termination in bad faith. To support her argument, she relies on *Randolph v. New England Mutual Life Ins. Co.*, 526 F.2d 1383 (6th Cir.1975), and *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728 (8th Cir.2003).

Apart from the fact that this federal authority is not binding on this court, the *Yarborough* case does not appear to be at odds with Farmers's position that the implied covenant of good faith does not apply (1) where the parties have expressly disavowed any limitations on their discretion, and (2) the consequences of the exercise of that discretion are easily foreseeable. The termination clause at issue provides for termination on three months'

written notice without cause. The parties clearly bargained for such termination on three months' notice, and an implied covenant should not be used to limit an expressly bargained-for term. Moreover, a genuine issue of material fact that Farmers terminated Gunn's contract in bad faith is lacking in this case.

## III. *Tortious Interference*

Gunn next raises her claim of interference with a contractual relationship or business expectancy. She acknowledges that a party cannot tortiously interfere with its own contract and, therefore, limits her claim to FGI, which was not a named party to the contract. She maintains that her action is not time barred and, also, that FGI was involved in a scheme to terminate her contract without good cause through the use of the DARG program. Gunn's arguments are without merit because her claim is time barred, and there is no genuine issue of material fact as to whether FGI used the DARG program to terminate her without good cause.

Tortious interference with a contractual relationship or business expectancy is intentional and improper conduct by a person that induces or otherwise causes a third person not to perform a contract. *Quality Optical of Jonesboro, Inc. v. Trusty Optical, L.L.C.*, 365 Ark. 106, 109, 225 S.W.3d 369, 372 (2006) (citing *Mason v. Wal–Mart Stores*, 333 Ark. 3, 969 S.W.2d 160 (1998)). It is well established that a cause of action accrues the moment the right to commence an action comes into being, and the statute of limitations commences to run from that time. *Id.* at 109–10, 225 S.W.3d at 372. The statute of limitations governing tortious interference with a contract is found in Arkansas Code Annotated section 16–56–105, which provides, in part: "The following actions shall be commenced within three (3) years after the cause of action accrues: (3) All actions founded on any contract or liability, express or implied [and] (6) [a]ll actions for taking or injuring any goods or chattels." Ark.Code Ann. § 16–56–105 (Repl.2005). The statutory limitations period begins to run when there is a complete and full cause of action and, in the absence of concealment or wrong, when the injury occurs, not when it is discovered. *Quality Optical*, 365 Ark. at 110, 225 S.W.3d at 372. Gunn claims that her cause of action is not time barred because it was not complete until she was actually terminated on December 27, 2004, and not when she was advised of her termination on September 22, 2004.

In her first complaint, Gunn based her tortious interference claim on the following actions:

1. The institution of Consumer Report scoring by Farmers as part of the rate structure in 2002.

2. Effective January 1, 2002, Farmers eliminated the Town Class Exception involving fire departments for two years.

3. Farmers intentionally and regularly interfered with her business, beginning June 18, 2003, by requiring her to produce meaningless data and numbers.

Her amended complaint reveals the same actions and adds only that the DARG program specifically states "in keeping with our contractual relationship, agents are not assigned sales quotas or sales goals, nor are they required to provide written plans and objectives for the development of the agency." According to her pleadings, Gunn was placed on the DARG program in June 2003.

It appears that Gunn did not contend before the circuit court that her placement on the DARG program consti-

tuted tortious interference. But in addition to this, if this court construed her original complaint as referring to the DARG program, all of the actions she complains of are time barred. Gunn filed her first complaint on October 17, 2007. All of the events which are the essence of her complaint, including her placement on the DARG program, occurred in 2002 and 2003. Her claim, therefore, was not filed until well after the three-year statute of limitations. This court does not recognize a continuing tort theory. *Quality Optical,* 365 Ark. at 110, 225 S.W.3d at 372. Because all of the actions which form the essence of her complaint occurred more than three years prior to the filing of her complaint, Gunn's tortious interference claim against FGI is time barred.

## IV. *Fraud and Deceit*

Gunn next claims that Jerry Carter induced her to sign Agreement III by making false representations, and that summary judgment, as a result, was improper.

We first consider whether this issue is time barred. Gunn signed Agreement III in 1991. Arkansas Code Annotated section 16–56–105 provides a three-year statute of limitations on claims for fraud in the inducement.[3] In granting the motion for summary judgment, the circuit court relied on *Wilson v. General Electric Capital Auto Lease, Inc.,* 311 Ark. 84, 841 S.W.2d 619 (1992).

The facts in *Wilson* are straightforward. In February 1987, Robert and Cindy Wilson signed a contract to lease a 1987 Toyota Camry from Jones Toyota for five years. *Id.* at 86, 841 S.W.2d at 620. They claimed that the leasing manager told them they could return the car to the car dealership in three years and could walk away not owing anything. *Id.* They also alleged that he told them they would not need excess-mileage coverage if they returned the car in three years. *Id.* After three years, the Wilsons reached the 75,000 mile mark on their Camry and attempted to return the vehicle. *Id.* General Electric Capital Auto Lease refused to take the car back. *Id.* Provision K of the contract entitled, "Early Termination," provided a formula for an early termination charge, should the party contracting to lease the car want to terminate the contract before the five-year term ended. *Id.*

The Wilsons filed their complaint three years and four months after executing the contract. *Id.* at 86, 841 S.W.2d at 620. The circuit court granted summary judgment because the claims based on misrepresentation were barred by the statute of limitations. *Id.,* 841 S.W.2d at 620. On appeal, this court affirmed and ruled that the Wilsons knew or should have known of the contract's actual provisions so there was no genuine issue of material fact precluding summary judgment. Gunn attempts to distinguish her case based on the fact that she asked Carter about the three-month termination provision and exercised reasonable diligence by discussing it with Carter.

The circuit court in the instant case determined that Gunn's cause of action was time barred because the statute of limitations began to run when she received the letter notifying her that

---

3. Arkansas Code Annotated section 16–56–105(1) provides:

The following actions shall be commenced within three (3) years after the cause of action accrues:

(1) All actions founded upon any contract, obligation, or liability not under seal and not in writing, excepting such as are brought upon the judgment or decree of some court of record of the United States or of this or some other state.

Farmers wished to exercise its rights under provision C of Agreement III. She argues that her cause of action was not complete until she was actually terminated. We disagree. The contract required three months' notice prior to termination. The termination letter dated September 22, 2004, states clearly: "We have elected to exercise Paragraph 'C' and terminate your contract effective December 27, 2004." The statute of limitations began to run at this point, when she knew or should have known that paragraph C did not mean what Carter now contends it meant. Gunn did not file her complaint until December 27, 2007. We conclude that her claim is time barred.[4]

## V. *Arkansas Franchise Practices Act*

Gunn's final point on appeal is that she was a franchisee under the Arkansas Franchise Practices Act (Franchise Act). Gunn asserts that the circuit court misapplied the Franchise Act when it concluded that as a matter of law she was not a franchisee under these facts. Farmers counters that the circuit court properly applied the Franchise Act and this court's decision in *Stockton v. Sentry Insurance*, 337 Ark. 507, 989 S.W.2d 914 (1999), when it determined that there was no genuine issue of material fact over whether Gunn was a franchisee.

A franchise is defined by the Franchise Act as:

a written or oral agreement for a definite or indefinite period in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory or to *sell or distribute* goods or services within an exclusive or nonexclusive territory at wholesale or retail, by lease agreement, or otherwise.

Ark.Code Ann. § 4–72–202(1)(A) (Repl. 2001) (emphasis added).

The General Assembly designed the Franchise Act for the protection of the public and aired its purpose in the emergency clause:

that some franchisors have, without good cause and to the great prejudice and harm of the citizens of the State of Arkansas, cancelled existing franchise agreements and that other such cancellations are threatened; and that only by the immediate passage of this Act can this situation be remedied and it is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise agreements.

Act of Mar. 4, 1977, No. 355 § 13, 1977 Ark. Acts 592. This court has held that the Franchise Act should be liberally construed to carry out the legislative goal. *Dr. Pepper Bottling Co. of Paragould v. Frantz*, 311 Ark. 136, 143, 842 S.W.2d 37, 41 (1992).

In *Stockton v. Sentry Insurance*, we addressed the issue of whether an insurance agent's business made him a franchisee under the Franchise Act. Russ Stockton was an insurance agent for Sentry Insurance. *Stockton*, 337 Ark. at 511, 989 S.W.2d at 916. He signed an "Employment Application" with Sentry that con-

---

4. The circuit court ruled that Gunn was on notice of the potential fraud in 1991, when she signed Agreement III. To support that ruling, the circuit court pointed out that Agreement III plainly contradicts the statements of Carter in 1991. The court, therefore, found that she was on notice the day she signed the contract in 1991. While this may be true, it is certainly clear that she was on notice on September 22, 2004, when she received the termination letter. This court need not decide if she exercised "due diligence" at the time she signed the contract to resolve the statute-of-limitations issue.

tained an authorization for investigative reporting and drug testing. *Id.* at 511–12, 989 S.W.2d at 916. That authorization read that all employees would be "at-will." *Id.* at 512, 989 S.W.2d at 916. Stockton also executed a "Sales Representative Employment Contract." *Id.* This document delineated the parameters of the relationship between Stockton and Sentry Insurance. *Id.*, 989 S.W.2d at 916–17. In paragraph number two, the following language appears:

> [T]he sales representative shall submit each and every such application for insurance to the employer or its appropriate affiliate or subsidiary as directed by the employer, and the *Employer*, or its affiliate or subsidiary, as the case may be, *shall have the absolute right to accept or reject the same.*

*Id.* at 512, 989 S.W.2d at 917 (emphasis added).

Because of this language, this court held in *Stockton:*

> Plainly, the legislature intended the statute to apply where a person grants another person a license to "sell or distribute goods or services within an exclusive or nonexclusive territory ..." In the instant case, Stockton maintained no inventory, had no authority to set prices, and could not enter into a binding contract of insurance. Stockton's authority went no further than to solicit and procure applications for insurance ... The Illinois appeals court's holding in *Vitkauskas v. State Farm Mut. Auto. Ins.*, 157 Ill.App.3d 317, 109 Ill.Dec. 373, 509 N.E.2d 1385 (1987) is also persuasive. There, the court held the Illinois Franchise Act inapplicable to an insurance salesman where he had no authority to consummate a sale but could only solicit applications. We therefore hold that the trial court properly dismissed the claim as a matter of law in that no genuine

issue of fact existed as to whether appellant had a franchise from Sentry Insurance.

*Id.* at 512–13, 989 S.W.2d at 917.

It is clear to this court that our decision in *Stockton* was grounded on the pivotal fact that Stockton could not consummate a sale of insurance. In holding as we did, we relied on *Kent Jenkins Sales, Inc. v. Angelo Brothers Co.*, 804 F.2d 482 (8th Cir.1986), where a franchise was not found because Jenkins did not have the *unqualified* authority to transfer the goods involved and, thus, was not an actual seller of the goods. We also looked to *Vitkauskas v. State Farm Mutual Automobile Insurance Company*, 157 Ill.App.3d 317, 109 Ill.Dec. 373, 509 N.E.2d 1385 (1987), where the insurance salesman was deemed not to be an insurance salesman because he had no authority to "consummate a sale," as already noted. In its discussion of what it meant to sell, the Illinois appellate court said:

> The right to sell consists of an *unqualified* authorization to transfer a product at the point and moment of the agreement to sell or authority to commit a grantor to sell. The plaintiff did everything he could legally and responsibly do to effect a sale, but the sale could not be effective until approval of the defendant was forthcoming. Plaintiff could not commit the defendant to a binding contract of insurance. He could solicit an application for insurance, but he could not sell within the meaning of the IFDA.

*Id.* at 1391 (emphasis added).

In the case at hand, Gunn could not change the terms of any insurance policy, and she did not have the "unqualified authorization" to transfer a product at the time of sale or permanently bind Farmers to a contract. Gunn is most fairly characterized as a promoter or solicitor for the insurance procured.

██ Gunn would like to equate the authority to grant a temporary "binder" for coverage to the authority to issue permanent insurance. This is not correct. Arkansas Code Annotated section 23–79–120 permits oral and written temporary insurance coverage, referred to as a binder.[5] Farmers urges that Gunn's power to temporarily bind it to insurance derives from this statute. Section 23–79–120, though, merely permits insurance companies to issue temporary binders and provides rules to govern those binders. It does not require companies to issue binders and cannot, as a consequence, be said to create the power in an agent to bind an insurance company. Farmers's decision to allow agents to issue temporary coverage, no doubt, was for the convenience of business and to make its policies more attractive to customers because they could get instant coverage. But, ultimately, under Agreement III only business acceptable to Farmers would be permanently covered. Hence, Gunn did not have the unqualified power to bind Farmers permanently to underwrite an insurance policy.

Other jurisdictions have made similar findings where the insurance company retains the power to accept or reject policies written by the agent. While we recognize that these holdings are nonbinding on the court, we find the holdings of these courts to be persuasive. *See Keeney v. Kemper Nat'l Ins. Cos.*, 960 F.Supp. 617 (E.D.N.Y. 1997) *aff'd sub nom.*, 133 F.3d 907 (2d

Cir.1998) (holding that where the insurance agent was authorized to bind the company only to the extent of a specific authority granted and where the insurance company retained exclusive and absolute control over the underwriting and acceptance of all policies generated, there was no franchise agreement under the New York Franchise Sales Act as a matter of law); *Durst v. Illinois Farmers Ins. Co.*, No. 05 C 574, 2006 WL 140546 (N.D.Ill.Jan. 12, 2006) (granting insurance company's motion to dismiss under the Illinois Franchise Disclosure Act where the agreement clearly contemplates that any insurance policies sold by the agent had to be first approved by the insurance company).

Gunn goes on to argue that her case is factually different from *Stockton.* For example, she asserts that she was an independent contractor—not an employee. That distinction, however, while relevant, is not determinative of whether a franchise exists. *See Vitkauskas v. State Farm Mut. Auto. Ins. Co.*, 157 Ill.App.3d 317, 109 Ill.Dec. 373, 509 N.E.2d 1385. Gunn adds that she had an office building and had authority to adjust claims by contract, within "her authority." Her authority to adjust, however, according to her district manager, Mike Wolfe, was on a "very, very limited" basis.

Accordingly, as was the case with *Stockton,* Gunn did not have the unqualified

---

5. Arkansas Code Annotated section 23–79–120 provides:

    (a) Binders or other contracts for temporary insurance may be made orally or in writing and shall be deemed to include all the usual terms of the policy as to which the binder was given together with such applicable endorsements as are designated in the binder, except as superseded by the clear and express terms of the binder.

    (b) No binder shall be valid beyond the issuance of the policy with respect to which it was given, or beyond ninety (90) days from its effective date, whichever period is the shorter.

    (c) If the policy has not been issued, a binder may be extended or renewed beyond the ninety (90) days with the written approval of the Insurance Commissioner or in accordance with such rules and regulations relative thereto as the commissioner may promulgate.

    (d) This section shall not apply to life insurance or accident and health insurance.

authority to sell policies or commit Farmers to an insurance contract other than a temporary binder, which, by definition, could be cancelled at any time at the discretion of Farmers. Gunn had no authority to change or set prices, evidenced by her complaint that Farmers continued to change policies and increase prices, which resulted in her loss of business. As she said in her deposition, "I lost a ton of business over credit scoring. I had lost policies like other agents had because of different underwriting rules that had changed." Gunn had no authority to change the premium, the date the payment was due, or the terms of the insurance policy. She admits that she did not sell any tangible product, and she did not charge money outside of the premium paid to Farmers for insurance services. She further admits that the money that changed hands consisted of premiums that she forwarded on to the companies.

We conclude that only policies "acceptable" to Farmers could be underwritten under Agreement III, and only Farmers under that agreement could commit the company to coverage. The unqualified authority to sell or distribute goods or services is an essential component of a franchise agreement. *See* Ark.Code Ann. § 4–72–207(1)(A) (Repl.2001). That authority in Gunn was lacking in this case, as Agreement III makes patently clear. We consider this factor determinative for purposes of the Franchise Act, as it was in *Stockton.*

The dissent focuses on independent-contractor status and limited binding and adjustment authority but that is not the test under the statute, Arkansas Code Annotated section 4–72–202(1)(A), or the *Stockton* case. The ability to sell is what is critical under the statute and Gunn did not have that authority. Only policies "acceptable" to Farmers could be underwritten. More-

over the *Stockton* case made it clear that (1) maintaining an inventory, (2) the authority to set prices, and (3) the ability to enter into a binding contract of insurance were essential to franchise status. The authority to enter into a temporary binder does not equate to the ability to sell.

Other jurisdictions have recognized that the single most important factor in determining whether a franchisee has the right to sell the franchisor's goods or services is the ability to transfer the product itself or commit the franchisor to a transaction at the moment of the agreement to sell. *See, e.g., John Maye Co. v. Nordson Corp.,* 959 F.2d 1402, 1406 (7th Cir.1992). It is not enough that a party has the authority to do everything but give final approval of the order or sale. *Id.* at 1407–08.

Affirmed.

HANNAH, C.J., DANIELSON and WILLS, JJ., concur in part and dissent in part.

PAUL E. DANIELSON, Justice, concurring in part, dissenting in part.

While I concur with the majority's holding on all other points, I respectfully dissent on the question involving the Arkansas Franchise Practices Act (AFPA), as I believe that a genuine issue of material fact exists. As set forth by the majority, "franchise" is defined within the AFPA as

a written or oral agreement for a definite or indefinite period in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory or to sell or distribute goods or services within an exclusive or nonexclusive territory at wholesale or retail, by lease agreement, or otherwise.

Ark.Code Ann. § 4–72–202(1)(A) (Repl. 2001). While this court did hold in *Stockton v. Sentry Insurance,* 337 Ark. 507, 989 S.W.2d 914 (1999), that Stockton had no franchise from Sentry, its facts can be clearly distinguished from those in the case before us.

There, Stockton was an employee of Sentry and his "sales representative employment contract" merely mandated that he "solicit and procure applications for insurance." 337 Ark. at 512, 989 S.W.2d at 917. In fact, the *Stockton* court noted that his "authority went no further than to solicit and procure applications for insurance," and it found this distinction "crucial." *Id.* at 512–13, 989 S.W.2d at 917. So, yes, the majority is correct that the decision in *Stockton* was premised on the fact that Stockton could not consummate a sale; however, the *Stockton* court so decided because Stockton's agreement was completely devoid of any language permitting him to sell.

That is distinctly different from the case at hand, in which Gunn explicitly agreed in Agreement III to "sell insurance for the Companies." In addition, unlike the salesman in *Vitkauskas v. State Farm Mutual Automobile Insurance Co.,* 157 Ill.App.3d 317, 109 Ill.Dec. 373, 509 N.E.2d 1385, 1391 (1987), who "could not commit the defendant to a binding contract of insurance," Gunn could; thus, her right to bind coverage did consist of an "unqualified authorization to transfer a product," in that her clients walked away with coverage once bound. *Id.* Finally, she was an independent contractor, rather than an employee, and she did have limited authority to adjust claims by contract.

As this court has today, and previously, acknowledged, we give a liberal construction to the act to effectuate its remedial purposes. *See Stockton, supra.* Viewing the evidence in the light most favorable to Gunn, resolving all doubts and inferences against Farmers, and taking into account the liberal construction we must give the AFPA, I would hold that Gunn has met proof with proof and demonstrated the existence of a material fact. Accordingly, I would reverse the circuit court's grant of summary judgment on Gunn's AFPA claim, and I respectfully concur in part and dissent in part.

HANNAH, C.J., and WILLS, J., join.